UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DETROIT RECEIVING HOSPITAL and
UNIVERSITY HEALTH CENTER, *et al.*,

    Plaintiffs,

-vs-

MICHAEL O. LEAVITT, Secretary of
Health and Human Services,

    Defendant.

                                    /

Case No. 07-11181
Judge Avern Cohn

# MEMORANDUM AND ORDER
# DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
# GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. Introduction

This is a health care case. Plaintiffs, a group of public and private hospitals, seek to recover additional reimbursement from the federal government related to their provision of services under the Medicare program. Specifically, plaintiffs challenge a regulation promulgated by the Defendant Secretary of Health and Human Services ("the Secretary") pertaining to the reimbursement of bad debt associated with a certain class of Medicare beneficiaries of limited means, known as "qualified Medicare beneficiaries" ("QMBs"). To qualify as a QMB, a Medicare beneficiary must have an income and asset level falling below a specified minimum amount. The regulation at issue, 42

C.F.R. § 413.89(h), provides that the government will reimburse service providers for only a fraction of their Medicare bad debt.  At the same time, the Medicare statute bars providers from attempting to collect bad debts directly from QMBs.  Accordingly, service providers cannot recover the full amount of bad debts associated with QMBs.  Plaintiffs say that the regulation is therefore inconsistent with the statutory ban on "cross-subsidization."  42 U.S.C. § 1395x(v)(1)(A)(i).  The resolution of the legal issue presented by the case thus requires adjudication of the validity of the regulation, 42 C.F.R. § 413.89(h), as it applies to QMBs.  Plaintiffs say that the regulation is invalid and further that the statute entitles them to additional bad debt reimbursement for fiscal years 1998, 1999, and 2000.

Before the Court are the parties' cross-motions for summary judgment.  For the reasons discussed below, plaintiffs' motion will be denied and the Secretary's motion will be granted.

## II.  Background

### A.  The Medicare Statute and Regulations

The Medicare Act establishes a system of government-provided health insurance for the aged and disabled.  42 U.S.C. § 1395 *et seq*.  Providers of inpatient hospital services are entitled to payment from Medicare for "reasonable costs" incurred in providing services to Medicare patients in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A); see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 506-07 (1994).  The Secretary has delegated the responsibility for administering the Medicare program to the Administrator of the Centers for Medicare and Medicaid Services.

Prior to 1983, all Medicare reimbursements to hospitals were based on a retrospective determination of the "reasonable cost" of treatment. See 42 U.S.C. § 1395x(v); 42 C.F.R. § 413.1 et seq. The statute provided that "reasonable cost" is the "cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services." 42 U.S.C. § 1395x(v)(1)(A). The statute further provided that the Secretary's

> regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services.

Id.

In 1983, the Medicare statute was amended to establish a payment system under which hospitals were to be reimbursed on a per discharge basis through prospectively-fixed rates based on the "diagnostic related group" to which the discharge is assigned. 42 U.S.C. § 1395ww(d); 42 C.F.R. § 413.1 et seq. However, some Medicare reimbursements continued to be paid based on a retrospective "reasonable cost" basis, including "Medicare bad debt": the unpaid deductible and copayment obligations of Medicare beneficiaries. 42 C.F.R. §§ 412.115(a), 413.89. The Medicare

3

deductible is the annual sum that a beneficiary must pay before Medicare coverage becomes effective. 42 C.F.R. § 409.82. The Medicare copayment, also called coinsurance, is the amount that a beneficiary must pay for certain treatment after Medicare coverage becomes effective. 42 C.F.R. § 409.83.

### B. Medicare Bad Debt Reimbursement

Generally, in order to be eligible for reimbursement of Medicare bad debt, Medicare service providers must show that they made reasonable collection efforts and that, despite these efforts, they are unlikely to collect on the debt. 42 C.F.R. § 413.89(e).

The regulations explain the purpose of the bad debt reimbursement:

> Under Medicare, costs of covered services furnished beneficiaries are not to be borne by individuals not covered by the Medicare program, and conversely, costs of services provided for other than beneficiaries are not to be borne by the health insurance program. Uncollected revenue related to services rendered to beneficiaries of the program generally means that the provider has not recovered the cost of services covered by that revenue. The failure of beneficiaries to pay the deductible and coinsurance amounts can result in the related costs of covered services being borne by other than Medicare beneficiaries. To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts which remain unpaid are added to the Medicare share of allowable costs. Bad debts arising from other sources are not allowable costs.

42 C.F.R. § 413.89(d).

Prior to 1997, the government reimbursed 100% of providers' Medicare bad debt. Congress amended the Medicare statute through the Balanced Budget Act of 1997 to provide for reduced payments. Pub. L. No. 105-33 § 4451, 111 Stat. 251 (1997). As

4

amended, the statute provides for a 25% reduction in Medicare bad debt reimbursements for fiscal year 1998, a 40% reduction for 1999, and a 45% reduction in 2000.  42 U.S.C. § 1395x(v)(1)(T).  The House Ways and Means Committee explained the purpose of the bad debt reductions: "Providers require greater incentives to aggressively pursue bad debt related to Medicare coinsurance and deductibles.  Current policy provides little incentive to do so because Medicare reimburses certain hospitals and other providers for its bad debt related to Medicare on an allowable cost basis."  H.R. REP. No. 105-149, at 1344 (1997).

Congress subsequently amended the statute again, as part of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, to provide for a 30% reduction for fiscal year 2001 and each year thereafter.  Pub. L. No. 106-554, Appendix F, § 541, 114 Stat. 2763A-463, 2763A-550 (2000); 42 U.S.C. § 1395x(v)(1)(T)(iv).

The Secretary has promulgated a regulation implementing this schedule of reductions.  42 C.F.R. § 413.89(h)(1).  The regulation essentially replicates the language of the statute.

### C. Qualified Medicare Beneficiaries

This case concerns the Medicare bad debt reduction as it applies to QMBs. QMBs, in addition to meeting the ordinary requirements for Medicare eligibility, have incomes not exceeding the federal poverty line and personal assets not exceeding twice the maximum allowable amount for receiving benefits under the Supplemental Security Income program.  42 U.S.C. § 1396d(p); 42 C.F.R. § 400.200.  QMBs include individuals who are eligible both for Medicare (by virtue of their age) and Medicaid (by

5

virtue of their income). These individuals are sometimes called "dual-eligibles." QMBs also include individuals whose incomes and personal asset levels are high enough to make them ineligible for Medicaid, but low enough that they fit within the statutory definition of QMBs. These individuals are sometimes called "pure QMBs."

The Medicaid Act requires state Medicaid agencies to provide "for making medical assistance available for medicare cost-sharing...for qualified medicare beneficiaries." 42 U.S.C. § 1396a(a)(10)(E)(1). The statute defines "medicare cost-sharing" to include Medicare premiums, copayments, and deductibles. 42 U.S.C. § 1396d(p)(3). Thus, state Medicaid agencies are generally required to pay copayments and deductibles chargeable to QMBs.

However, the Medicaid Act also permits state Medicaid agencies, if they so choose, to impose a payment "cap" for copayments and deductibles of QMBs. 42 U.S.C. § 1396a(n)(2).[1] Under this provision, if the Medicare payment for services to a QMB exceeds the rate that the state Medicaid agency would have paid for the same services under Medicaid, the state agency is not required to pay the additional amount. That is, the state's cost-sharing obligation may be capped at the Medicaid rate rather than the Medicare rate. This provision is known as the "Medicaid QMB cap." For the fiscal years at issue in this case, both the Michigan and Missouri Medicaid agencies elected to impose the cap.

---

[1] Section 1396a(n)(2) provides: "a State is not required to provide any payment for any expenses incurred relating to payment for deductibles, coinsurance, or copamyents for Medicare cost-sharing to the extent that payment under title XVIII [Medicare] for the service would exceed the payment amount that otherwise would be made under the State plan under this title for such service if provided to an eligible recipient other than a Medicare beneficiary."

6

The Ninth Circuit has explained how the Medicare QMB cap works in practice:

> For example, suppose the following facts: (1) a hospital incurs a cost of $100 in providing services to a [QMB]. (2) Medicare, under Part B, pays $80 of that cost. The amount representing the coinsurance and/or deductible usually paid by a non-[QMB] Part B enrollee is $20. If [the state Medicaid agency] determines that it would only pay $60 for the care provided to the [QMB] if the patient were not enrolled in Part B, then it will pay none of the deductible/coinsurance to the health care provider (60 - 80 < 0, therefore [the Medicaid agency] pays none of the $20 coinsurance/deductible). However, if [the Medicaid agency] determines that it would have paid $90 of the covered service, then it will pay the provider $10 of the deductible/coinsurance (90 - 80 = 10, therefore [the Medicaid agency] pays for $10 of the $20 coinsurance/deductible).
>
> In these examples, the health care provider is shortchanged by $20 and $10 respectively.

Cmty. Hosp. of the Monterey Peninsula v. Thompson, 323 F.3d 782, 786-87 (9th Cir. 2003).

The statute also expressly provides that, where the state Medicaid agency has elected to impose the Medicaid QMB cap, the QMBs do not have any legal liability to health care service providers for the cost of Medicare services or cost-sharing amounts. 42 U.S.C. § 1396a(n)(3)(B). Providers are prohibited from seeking to collect such amounts from QMBs. 42 U.S.C. § 1396a(n)(3). Therefore, if providers have Medicare bad debt associated with QMBs, they have no choice but to accept the fractional reimbursement from the government. Providers must simply absorb the shortfall representing the difference between the Medicaid rate and the Medicare rate multiplied by the bad debt reimbursement percentage.

### D. Procedural Background

At the end of each fiscal year, a Medicare service provider must file a cost report with a fiscal intermediary that acts as an agent of the Secretary. 42 U.S.C. § 1395h. In this case, the intermediary for the Michigan hospitals during the fiscal years at issue was Blue Cross Blue Shield Association and its subcontractors, and the intermediary for St. Luke's Hospital in Kansas City, Missouri was Mutual of Omaha. The intermediary analyzes the provider's cost report, auditing it in some cases, and issues a "notice of program reimbursement" with the amount it determines the provider is owed for the year. 42 C.F.R. § 405.1803.

A provider dissatisfied with the notice of program reimbursement may, if the amount in controversy is at least $10,000, request a hearing before the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo(a). The Secretary may reverse or modify a decision of the Review Board within 60 days after its issuance; otherwise, the Review Board's decision becomes the final decision of the Secretary. 42 C.F.R. §§ 405.1871(b), 405,1875(a).

Providers may also obtain judicial review of any final decision of the Secretary. 42 U.S.C. § 1395oo(f)(1). Moreover, even before the Review Board issues a decision, providers may ask for "expedited judicial review." Under this procedure, providers ask the Review Board to certify that it lacks authority to decide a "question of law or regulations relevant to the matters in controversy." Id. If the Review Board agrees that it lacks such authority, it sends a notice to the provider or providers, who then have 60 days to file a lawsuit. Id. Venue for a group appeal lies in the District Court for the District of Columbia or in the district court in which the greatest number of providers are located. Id.

In this case, the Review Board granted the plaintiff's request for expedited judicial review. Although it had procedural jurisdiction over the appeal, the Review Board is bound by the Secretary's regulations and thus lacks the authority to grant the relief requested by the plaintiffs. Venue is proper as all but one of the plaintiffs are located within this district.

### III. Standard of Review

While each party's motion is styled as a motion for summary judgment, there are no disputed issues of fact.[2] The case turns on the purely legal question of whether the Secretary acted within his lawful authority in promulgating the regulation in question, 42 C.F.R. § 413.89(h)(1).

Judicial review of a final decision of an agency is governed by the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*. Pursuant to the statute, courts have established a two-step process for reviewing an agency's interpretation of a statute that it administers. See Chevron U.S.A., Inc. v. Nat. Resources Defense Council, Inc., 467 U.S. 837 (1984). "First, always, is the question whether Congress has directly spoken to the *precise question at issue*. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Jewish Hosp., Inc. v. Sec'y of HHS, 19 F.3d 270, 273 (6th Cir. 1994) (emphasis in original). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear legislative intent." Chevron, 467 U.S. at 843 n.9.

---

[2] The parties have filed two stipulations: one setting out the material facts and the other a documentary trail.

9

If the statute is ambiguous or silent as to the precise question at issue, a court must determine "whether the agency's answer is based on a permissible construction of the statute." Jewish Hosp., 19 F.3d at 273. In answering this question, a reviewing "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843, n.11. Rather, the agency's construction should be upheld unless it is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844; see also 5 U.S.C. § 706(2).

## IV. Analysis

As noted above, there are no material factual disputes in this case. The parties disagree on the purely legal question of whether the regulation governing the reimbursement of Medicare bad debt associated with QMBs, 42 C.F.R. § 413.89(h)(1), is a valid exercise of the Secretary's authority under the Medicare Act.

### A. The Statute

In analyzing the validity of the regulation, the starting point is the text of the Medicare Act. As noted above, the statute provides that Medicare bad debt is to be reimbursed retrospectively as a "reasonable cost" of providing Medicare services, rather than as part of the prospectively-fixed rates assigned to various classes of services. The statute defines "reasonable cost" as the "cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs

for various types or classes of institutions, agencies, and services." 42 U.S.C. § 1395x(v)(1)(A). More specifically, the statute provides that

> In determining such reasonable costs for hospitals, no reduction in copayments under Section 1395*l*(t)(8)(B) of this title shall be treated as a bad debt and the amount of bad debts otherwise treated as allowable costs which are attributable to the deductibles and coinsurance amounts under this subchapter shall be reduced–
>
> (i) for cost reporting periods beginning during fiscal year 1998, by 25 percent of such amount otherwise allowable,
>
> (ii) for cost reporting periods beginning during fiscal year 1999, by 40 percent of such amount otherwise allowable,
>
> (iii) for cost reporting periods beginning during fiscal year 2000, by 45 percent of such amount otherwise allowable, and
>
> (iv) for cost reporting periods beginning during a subsequent fiscal year, by 30 percent of such amount otherwise allowable.

42 U.S.C. § 1395x(v)(1)(T).

### B. The Regulation

Pursuant to this statutory provision, the Secretary issued the regulation governing reductions in Medicare bad debt reimbursements. The regulation provides in full:

> In determining reasonable costs for hospitals, the amount of bad debt otherwise treated as allowable costs (as defined in paragraph (e) of this section) is reduced--
>
> (i) For cost reporting periods beginning during fiscal year 1998, by 25 percent;

11

> (ii) For cost reporting periods beginning during fiscal year 1999, by 40 percent;
>
> (iii) For cost reporting periods beginning during fiscal year 2000, by 45 percent; and
>
> (iv) For cost reporting periods beginning during a subsequent fiscal year, by 30 percent.

42 C.F.R. § 413.89(h)(1). Plaintiffs say that this regulation does not comport with the statute and should therefore be invalidated.[3]

### C. <u>Chevron</u> Step One

### 1.

On its face, the statute is straightforward and admits of no exceptions. Bad debts arising from unpaid deductibles and copayments, otherwise treated as allowable costs, are to be reduced by the applicable percentage for each cost reporting period.

Plaintiffs say, however, that 42 U.S.C. § 1395x(v)(1)(T), which the regulation mirrors, is ambiguous when read in the broader context of the statute as a whole, since it conflicts with another subsection that prohibits "cross-subsidization." Specifically, 42 U.S.C. § 1395x(v)(1)(A) provides that the Secretary's

> regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance

---

[3] Even if the regulation were held invalid, it does not necessarily follow that the plaintiffs are entitled to additional reimbursement, since the underlying statutory bad debt reduction provision, § 1395x(v)(1)(T), continues in force. Because the Court finds that the regulation is valid under the deferential <u>Chevron</u> standard, the Court need not undertake its own analysis of how to harmonize §§ 1395x(v)(1)(T) and 1395x(v)(1)(A). The Secretary has done so in the regulation. The question before the Court is whether the Secretary's action in promulgating the regulation passes muster.

12

> programs established under this subchapter) in order that,
> under the methods of determining costs, the necessary costs
> of efficiently delivering covered services to individuals
> covered by the insurance programs established by this
> subchapter will not be borne by individuals not so covered,
> and the costs with respect to individuals not so covered will
> not be borne by such insurance programs.

This statutory provision is also reflected in the regulations that define "reasonable cost": "[t]he objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program." 42 C.F.R. § 413.9(b)(1).

**2.**

Plaintiffs say that because they cannot collect outstanding debts from QMBs and are therefore compelled to accept the partial reimbursement for Medicare bad debt associated with QMBs, they necessarily recover only a fraction of the money owed to them under the statute. Further, because these lost moneys must be made up from other sources, the costs incurred with respect to QMBs are necessarily borne by patients not covered by the Medicare program. Plaintiffs thus argue that the apparent conflict between §§ 1395x(v)(1)(T) and 1395x(v)(1)(A) makes the statute ambiguous. See Comm'r of Internal Revenue v. Tufts, 461 U.S. 300, 315 (1983) (holding that the "apparent conflict" between two subsections of the tax code "renders the facial meaning of the statute ambiguous.").

**3.**

Subsections 1395x(v)(1)(T) and 1395x(v)(1)(A) do appear to be in tension. The plain language of subsection (A) seemingly requires Medicare providers to recover all of

the costs associated with Medicare beneficiaries from the beneficiaries themselves or from the government, and not from non-Medicare patients or other sources. Courts have, in some instances, strictly interpreted this provision to require that the government reimburse even indirect costs associated with the provision of Medicare services. See, e.g., Bedford Cty. Memorial Hosp. v. HHS, 769 F.2d 1017, 1023 (4th Cir. 1985) (invalidating regulation because it failed to account for administrative costs of malpractice insurance, potentially resulting in reimbursement amounts being too low to cover all malpractice costs associated with Medicare beneficiaries). The statutory reduction for bad debt reimbursements, when read in conjunction with the provisions prohibiting hospitals from attempting to collect bad debts from QMBs, necessarily results in Medicare providers recovering only a fraction of the Medicare bad debt associated with QMBs.

Given the apparent conflict between §§ 1395x(v)(1)(T) and § 1395x(v)(1)(A), the statute is ambiguous as to the question of whether the bad debt reduction provisions may be properly applied to debt associated with QMBs. Accordingly, the Secretary's regulation, which reflects the statute must be analyzed under the second step of the *Chevron* analysis.

### D. <u>Chevron</u> Step Two

**1.**

Under the second prong of the <u>Chevron</u> analysis, the Secretary's interpretation of the statute is afforded considerable deference. The regulation can be overturned only if it is "arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 844.[4] This is not the case here.

The Secretary's interpretation of the statute accords with the well-established rule of statutory construction that "where a specific provision conflicts with a general one, the specific governs." <u>Edmond v. United States</u>, 520 U.S. 651, 657 (1997). Here, the prohibition of cross-subsidization is a general provision that informs many specific rules governing Medicare reimbursements and prospective payments. By contrast, the Medicare bad debt reimbursement reduction provision sets specific rates for a particular class of payments. The Secretary's regulation reasonably gives effect to the more specific provision of the statute.

**2.**

Moreover, in arguing against giving effect to the bad debt reduction provision, plaintiffs adopt an unduly rigid construction of the prohibition on cross-subsidization. Under the plaintiffs' construction, anytime a Medicare provider fails to recover the

---

[4] Plaintiffs argue that the regulation is entitled to little or no deference in this case, since the Secretary's position is inconsistent with his position in a prior case, <u>Extendicare 99 Uncollect Co-In Dual Elig Group Provider v. Blue Cross/Blue Shield Association U.S. Gov't Services</u>, Decision of Administrator of CMS, 2006 WL 3227974 (Sept. 12, 2006). In <u>Extendicare</u>, the CMS Administrator denied claimed bad debt reimbursements for nursing home patients covered under Medicare Part B. <u>Extendicare</u> did not concern the Medicaid QMB Cap, and the Secretary's position in that case is not inconsistent with the position he takes here.

15

entirety of any cost associated with caring for a Medicare beneficiary, impermissible cross-subsidization results. The Sixth Circuit has not interpreted the ban on cross-subsidization in so strict a manner. In addressing a challenge to the Secretary's regulation setting out the "reasonable collection efforts" that a provider must undertake before being reimbursed for Medicare bad debt, the Sixth Circuit said that

> simply because [the agency] disallows certain bad debts does not mean that non-Medicare individuals necessarily pay these costs. First, the Hospital may still attempt to recover the bad debts from the debtors themselves. Second, following the Hospital's argument to its logical end would prohibit [the agency] from denying *any* bad debt reimbursement claims because of the chance that costs might be shifted to non-Medicare patients in some way. Therefore, we conclude that Plaintiff's argument is without merit.

Detroit Receiving Hosp. v. Shalala, 194 F.3d 1312 (table), 1999 WL 970277, at *6 (6th Cir. Oct. 15, 1999). Although in this case plaintiffs may not attempt to collect the bad debts from the QMBs, Detroit Receiving v. Shalala makes clear that the ban on cross-subsidization does not guarantee recovery of all of the costs associated with the provision of Medicare services in every instance. See also Royal Geropsychiatric Services, Inc. v. Tompkins, 159 F.3d 238, 245 (6th Cir. 1998) (holding, in the context of a challenge to regulations providing for reduced reimbursements for psychiatric services provided to QMBs under Medicare Part B, that "the plaintiffs' argument is premised to a great degree on a flawed reading of the Medicare Act, which nowhere guarantees 100% of a physician's reasonable charge.").

Moreover, Congress has regularly allowed the Medicare program to pay for some costs attributable to non-Medicare patients, for example by subsidizing charity care for

16

non-Medicare beneficiaries.  See generally Dean M. Harris, *Beyond Beneficiaries: Using the Medicare Program to Accomplish Broader Public Goals*, 60 WASH. & LEE L. REV. 1251, 1285-97 (2003).  Because these programs result in Medicare paying costs associated with non-beneficiaries, they too would run afoul of the prohibition on cross-subsidization if it is construed as strictly as plaintiffs suggest.  Clearly the courts have approved of Medicare programs aimed at benefitting the greater community.  See, e.g. Fischer v. United States, 529 U.S. 667, 679-80 (2000) (discussing Medicare benefits to health care providers "aimed at ensuring the availability of quality health care for the broader community").

**3.**

Finally, plaintiffs say that the applying the bad debt reimbursement reductions in states with a Medicaid QMB cap is "manifestly unfair," since it bars Medicare providers from recovering the full amount of Medicare bad debt.  Whatever the unfairness to service providers, the bad debt reduction provisions enacted in 1997 seem to have been responsive at least in part to Congress's "increasing concern over the rapidly expanding payout for bad debts under Medicare."  68 Fed. Reg. 6682 at 6684 (Feb. 10, 2003).  Between 1990 and 1994 alone, Medicare bad debt reimbursements to hospitals increased by 165 percent, from $415 million to $1.1 billion.  Id.  Given the competing interests of Medicare service providers and taxpayers, policy considerations do not clearly favor carving out an exception to the bad debt reduction provisions for debts associated with QMBs.  Certainly this is not a case in which the result is so absurd that it is appropriate for the Court effectively to amend the plain language of § 1395x(v)(1)(T) (which the regulation mirrors) by judicial decision.  The policy concerns that plaintiffs

raise are more appropriately considered by the Congress, not a court conducting a deferential review of an agency decision.

### V. Conclusion

The plaintiffs' motion for summary judgment is DENIED. The Secretary's motion for summary judgment is GRANTED. The case is DISMISSED.

SO ORDERED.

        s/Avern Cohn
        AVERN COHN
        UNITED STATES DISTRICT JUDGE

Dated: May 14, 2008

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, May 14, 2008, by electronic and/or ordinary mail.

        s/Julie Owens
        Case Manager, (313) 234-5160